# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Vinod S. Persad
_____

Write the full name of each plaintiff.

19 CV 03900

(Include case number if one has been assigned)

-against-

Bronx Family Court Judge Tracey A. Bing
Senior Supervising Bronx Family Court Judge Ruben Martino
Malikah Sherman, Noemi Elise Rodriguez,
Richard Mantellino / NYPD, NYS Commission on Judicial Conduct
Bronx Court Attorney Edgar D. Irizarry

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

## AMENDED
## COMPLAINT

Do you want a jury trial?
☑ Yes    ☐ No

RECEIVED
SDNY PRO SE OFFICE
2019 MAY 15  PM 3:29

SDNY
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/19

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑ **Federal Question**

☐ **Diversity of Citizenship**

## A. If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

- 14th Amendment Due Process of Law Rights, "Equal Protection" were violated.
- 4th Amendment violations to my persons and arbitrary search of my persons.
- 4th Amendment rights to be secure in my papers and persons
- 1st Amendment violations to freedom of Religion rights.
- 1st Amendment rights to petition redress of grievances were violated.
- 5th Amendment rights to life, Liberty and property, including to but not limited to my child.
- 8th Amendment rights to protect from inflicted cruel and unusual punishment, were violated.
- Federal Civil Rights Statutes Title 18, U.S.C., Section 241 - Conspiracy Against Rights
- Federal Civil Rights Statutes Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law

## B. If you checked Diversity of Citizenship

**1. Citizenship of the parties**

Of what State is each party a citizen?

The plaintiff ,_____ , is a citizen of the State of

(Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____ , is a citizen of the State of
                (Defendant's name)

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, _____ , is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach
additional pages if needed.

| Vinod | S. | Persad | |
|---|---|---|---|
| First Name | Middle Initial | Last Name | |

| 104-58 117st | | | |
|---|---|---|---|
| Street Address | | | |

| Richmond Hill | New York | 11419 | |
|---|---|---|---|
| County, City | State | Zip Code | |

| 718-690-8918 | | | |
|---|---|---|---|
| Telephone Number | Email Address (if available) | | |

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1: TRACEY BING

First Name          Last Name

FAMILY COURT JUDGE

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

900 SHERIDAN AVE    BRONX    NY    10451

County, City          State          Zip Code

Defendant 2: Ruben MARTINO

First Name          Last Name

FAMILY COURT SUPERVISING JUDGE

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

900 SHERIDAN AVE    BRONX    NY    10451

County, City          State          Zip Code

Defendant 3: MALIKAH SHERMAN

First Name          Last Name

ATTORNEY, MUNICIPAL EMPLOYEES LEGAL SERVICES

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

125 BARCLAY ST. N.Y. N.Y. 10007

County, City          State          Zip Code

Defendant 4:   NOEMI   RODRIGUEZ

First Name                         Last Name

PARENT TEACHER COORDINATOR

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

45-30   36th STREET L.I.C.   NY   11101

County, City                    State              Zip Code

Defendant 5:   RICHARD   MANTELLINO

First Name                         Last Name

NYPD   LIEUTENANT

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

F.O.I.L. UNIT ONE POLICE PLAZA N.Y. N.Y. 10038

County, City                    State              Zip Code

Defendant 6:   NEW YORK   POLICE DEPARTMENT

First Name                         Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

ONE POLICE PLAZA   N.Y. N.Y.   10038

County, City                    State              Zip Code

Defendant 7:   NYS COMMISSION ON JUDICIAL CONDUCT

First Name                         Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

61 BROADWAY SUITE 1200   NEW YORK N.Y.   10006

County, City                    State              Zip Code

DEFENDANT 8: BRONX COURT ATTORNEY EDGAR O. IRIZARRY

## III. STATEMENT OF CLAIM   900 SHERIDAN AVE, BRONX NY 10451.

Place(s) of occurrence:   Bronx County, Queens County, Manhattan County

Date(s) of occurrence:   2017 thru 2019

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

1) NYS Commission on Judicial Conduct Complaint against Judge Tracey A. Bing. **See attached additional pages for NYS Judicial Complaint filed.**
2) Supervising Judge Rueben Martino failure to rectify Judge Bing's behavior on the bench. Which allowed ongoing emotional, physical and financial harm to myself.
3) NYPD Lieutenant Richard Mantellino denial of FOIL request. Records of my personal injuries sustained as a victim of a crime were withheld from me. This caused harm to my case defense.
4) NYPD failure to act upon violations to Protection Orders. Officer stated that unless she says that she is going to "kill" me or "kill" the child, there's no violation. I believe that the reason of Protection Orders are to prevent such things from occurring. Placing myself and my daughter in preventable circumstances of physical harm.
5) Noemi Elise Rodriguez manipulation of the facts and false allegations have caused an onslaught of court troubles. There have been irreversible emotional, physical and psychological tolls on our daughter and I. There has been a smear campaign of my name, which continues till today. Ms. Rodriguez has colluded with Ms. Sherman in manipulating the law to remove our daughter from my life.
6) Malikah Sherman violations as an officer of the courts. Manipulation of the facts, violations to due process and obstruction of justice. **Ms. Sherman colluded with Judge Bing. Their intent to utilize our court system was harmful emotionally, physically and financially exhausting to me.**
7) These defendants are in collusion against me and violating my right to a fair trial.
8) These defendants are ignoring my evidences of child abuse.
9) They are preventing me from filing motions to report violations of orders of protection. All these obstructions are intentional and are skewing this case.
10) AMI Global Security – Forensics Report **See attached.**
11) Mental Health – Forensics Report **See attached.**
12) TRACEY BING'S COURT ATTORNEY HISPANIC EDGAR IRIZARRY FOR MY SUSPICIONS OF HIS ALLEGED FAVORITISM AND BIAS TOWARD MY HISPANIC EX-GIRLFRIEND NOEMI RODRIGUEZ AND AGAINST ME AN INDIAN.

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

- Stomach Injuries due to inflicted stresses by the courts and ongoing litigation. Medical treatment received for IBS, Stomach Ulcer flares.
- Parenting time withheld from my child which have lifelong affects to my child's development, health and quality of life.
- My child and I are targets of Parental Alienation and we are both currently still suffering this. There is NO cure for the damages that are sustained from this type of mental, physical and psychological abuse.
- Over the past two years I have received and currently continue professional counseling voluntarily, for Adjustment Disorder.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

$10,000,000.00

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 5/15/2019 | | |
|---|---|---|
| Dated | Plaintiff's Signature | |
| VINOD | S. | PERSAD |
| First Name | Middle Initial | Last Name |
| 104-58  117 st | | |
| Street Address | | |
| RICHMOND HILL | NY | 11419 |
| County, City | State | Zip Code |
| 718-690-8918 | | |
| Telephone Number | Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☐ Yes  ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.



**United States District Court**
**Southern District of New York**

# Pro Se (Nonprisoner) Consent to Receive Documents Electronically

Parties who are not represented by an attorney and are not currently incarcerated may choose to receive documents in their cases electronically (by e-mail) instead of by regular mail. Receiving documents by regular mail is still an option, but if you would rather receive them only electronically, you must do the following:

1. Sign up for a PACER login and password by contacting PACER[1] at www.pacer.uscourts.gov or 1-800-676-6856;

2. Complete and sign this form.

If you consent to receive documents electronically, you will receive a Notice of Electronic Filing by e-mail each time a document is filed in your case. After receiving the notice, you are permitted one "free look" at the document by clicking on the hyperlinked document number in the e-mail.[2] Once you click the hyperlink and access the document, you may not be able to access the document for free again. After 15 days, the hyperlink will no longer provide free access. Any time that the hyperlink is accessed after the first "free look" or the 15 days, you will be asked for a PACER login and may be charged to view the document. For this reason, *you should print or save the document during the "free look" to avoid future charges.*

## IMPORTANT NOTICE

Under Rule 5 of the Federal Rules of Civil Procedure, Local Civil Rule 5.2, and the Court's Electronic Case Filing Rules & Instructions, documents may be served by electronic means. If you register for electronic service:

1. You will no longer receive documents in the mail;

2. If you do not view and download your documents during your "free look" and within 15 days of when the court sends the e-mail notice, you will be charged for looking at the documents;

3. This service does *not* allow you to electronically file your documents;

4. It will be your duty to regularly review the docket sheet of the case.[3]

---

[1] Public Access to Court Electronic Records (PACER) (www.pacer.uscourts.gov) is an electronic public access service that allows users to obtain case and docket information from federal appellate, district, and bankruptcy courts, and the PACER Case Locator over the internet.

[2] You must review the Court's actual order, decree, or judgment and not rely on the description in the email notice alone. *See* ECF Rule 4.3

[3] The docket sheet is the official record of all filings in a case. You can view the docket sheet, including images of electronically filed documents, using PACER or you can use one of the public access computers available in the Clerk's Office at the Court.

# CONSENT TO ELECTRONIC SERVICE

I hereby consent to receive electronic service of notices and documents in my case(s) listed below. I affirm that:

1. I have regular access to my e-mail account and to the internet and will check regularly for Notices of Electronic Filing;

2. I have established a PACER account;

3. I understand that electronic service is service under Rule 5 of the Federal Rules of Civil Procedure and Rule 5.2 of the Local Civil Rules, and that I will no longer receive paper copies of case filings, including motions, decisions, orders, and other documents;

4. I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address, or if I wish to cancel this consent to electronic service;

5. I understand that I must regularly review the docket sheet of my case so that I do not miss a filing; and

6. I understand that this consent applies only to the cases listed below and that if I file additional cases in which I would like to receive electronic service of notices of documents, I must file consent forms for those cases.

**Civil case(s) filed in the Southern District of New York:**

**Note:** This consent will apply to all cases that you have filed in this court, so please list all of your pending and terminated cases. For each case, include the case name and docket number (for example, John Doe v. New City, 10-CV-01234).

_____

_____

_____
Name (Last, First, MI)

| | | | |
|---|---|---|---|
| Address | City | State | Zip Code |

| | |
|---|---|
| Telephone Number | E-mail Address |

| | |
|---|---|
| Date | Signature |

**Return completed form to:**

Pro Se Intake Unit (Room 200)
500 Pearl Street
New York, NY 10007

# ADDITIONAL PAGES

**FAMILY COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

**Judges Name:**

**Hon. Judge Tracey A. Bing**

<u>**Judges alleged misconduct includes and is not limited to the following:**</u>

1. I Vinod Persad, father to Zemirah A. Persad originally Petitioned the Queens Family Court of the State of New York on August 4th 2017. After my child was relocated from her home in Queens county to the Bronx county without my consent or acknowledgement. I was seeking help to protect my infant daughter, instead things became worse. This relocation of our daughter on or about July of 2017 has led to years of physical, emotional and psychological harm to our daughter.

2. Parental Alienation is a very serious matter in the development of infants and young children. I believe this factor was manipulated and minimized by Hon. Judge Tracey A. Bing. In fact it was made even worse leading to increasingly questionable behavior of your Hon. and opposing Counsel Ms.Sherman of DC 37.

3. Your honors alleged misconduct is jeopardizing the development, life and liberty of our daughter. It is causing myself damages financially, emotionally & physically.

4. This is not just a mere appearance of impropriety; this is ongoing malicious demonstrations by a public servant.

5. The Hon. Judges tone toward myself was consistently aggressive, explosive and chastising.

6. Your honor has been looking at me through the lens of contempt from the very beginning of this case.

7. This risk of actual bias or prejudgment that your honor has demonstrated must be forbidden and/or rectified, in order to guarantee due process is adequately implemented. Also, to ensure the safety of the children involved in family court matters.

8. Your honor consistently, with intent places myself the father into non-factual and manipulated incriminating allegations on the record. Your honor consistently steps off the bench and assumes the role of prosecutor biasedly in favor of the mother and in support of Ms. Shermans allegations against myself the father. This creates a court of dangerous bias and injustice.

9. Your honors behavior on the bench is endangering to the welfare of the minors in the cases that your honor presides over. All cases heard by this judge, past and present, should to be reviewed to ensure the safety and justice of all the children involved.

## Where and when, BACKGROUND AND PRELIMINARY FACTS

1. On December 22nd 2017 hearing at the Bronx Family Court Honorable Tracey A. Bing clearly stated that there was <u>NO REPORT</u> from Safe Horizon as of 10/22/2017 (transcript page #5 line #9).

I happened to meet the Bronx Safe Horizon supervisor Allison Bruel this same day on her break directly in front the Bronx Family Court entrance. I was with my dad. I wished Allison a Happy Holidays while I was walking away. Then I remember what your Honor stated on the record. I asked Allison how much longer does she have to submit the Safe Horizons report.

Allison stated that she submitted this report a long long time ago. Immediately after My last supervised visit with my daughter in her facility on November 14th 2017. I asked Allison if the report goes outside the court to a third party and how long does it take to get to the Judge?

The Safe Horizon supervisor Allison stated that its immediate. The report was sent electronically within the court and it's instant to the judge.

I believe that your honor did have the Safe Horizon report available. I believe your honor withheld this report of my supervised visits at Safe Horizon. This Safe Horizon report may have justified myself getting more time with my then 16-month-old daughter. However more parenting time for the father, I believe was not your honors intent.

2. On April 4th 2018 you Honor stated clearly on the record that both parents shared Equal Parenting time with the child (transcript page #6 line #3 thru #7). This statement by your honor was misleading and highly inaccurate.

Then when I the father even attempt to mention the parenting time and the transcripts, the Judge stops my defense, instructs me to put away the transcript and re-directs the trial (transcript November 29th 2018 page #20 thru #22). This I believe was intentional and violates my right to the preservation of the record.

3. April 4th 2018 hearing (transcript page #12 thru #15) your honor in collusion with Ms. Sherman's support, manipulate the evidences provided. Together they misrepresented the documents given to your Honor to establish the record with unfavorable findings against the father. Making it <u>appear as if</u> the father was in violation of a court order when in fact the mother was in violation of the court order.

The fact is that my <u>complete</u> email thread document, was looked at by your honor then placed <u>under</u> Ms. Sherman <u>in-complete</u> email thread document. I believe this was also done with intent by your honor to manipulate the presented evidences in Ms. Sherman's favor.

Your honor continues to single out the father alone and create a bias on the record. Your honor continues to state on the record that the father was in violation of the order of protection and would hate for anyone to get arrested for violations. This was very intimidating because I am the key factor in defending my daughter's life.

4. On June 21st 2018 Hearing for case #212868 I was now representing myself. I was instructed during this conference that Legal Advice to Self-Representing persons was available 3 days a week Tues-Thurs at the Bronx Family Court.

   I attempted to utilize these Court Recommended services on June 28th 2018 I came in person to the Bronx Family Court and spoke with Bronx Family Court attorney Patricia. Patricia informed me that there is NO record of my attorney being released. NOTE, this is 7 days after the Trial Conference where my attorney at that time, in attendance was RELIEVED by the Court (transcript page #8 line #10 thru #13). It was also established on the record that from this point that I would be representing myself.

   This failure by the court to communicate and or update the records of my case has resulted in my denial of Court-Attorney consultation time.  The fact that your honor constantly manipulates the record to make it appear that I am the one delaying this case, when in fact I am doing everything possible to accommodate the courts and the courts are obstructing my access to justice.

5. On June 27th 2018 I Vinod Persad faxed letter to Hon. Judge Bing in PART 17. Marked URGENT and FOR REVIEW. Pleading my concerns for the safety of my then 22-month old infant daughter.

6. To help assess the stability and capability of both parents to care for our child safely I filed Motion #1 dated July 2nd 2018 for Mental Health Evaluations of both parents. Fathers Motion was denied by your honor with prejudice.

   Why? When previously on April 4th 2018 hearing your Honor had stated that motion for forensics were welcomed, see transcript page #7 line #12 thru #15.

7. On October 26th 2018 hearing (transcript pages 43 thru 48).  I believe your honor strategically manipulated the record with the intent to assist opposing counsel by having myself alone, sent for mental health evaluations. Your honor asks me questions as if the answer was already known by your honor. Your honor cuts me off mid-answer several times. Your honor has been doing this since the very beginning of this case. Whether I was represented by an attorney or pro se my defense was often cut-off by your honor. As the case/trial moved forward any effort I made to get to the truth of the matter was not met by your honor very well. Whenever I defended myself from false allegations your honor became increasingly aggressive and biased towards me.

8. On October 26th 2018 your Honor contradicted her own conclusion about using a process server after colluding with Mrs. Sherman on the record (transcript October 26th 2018 pages #13 thru #18). First the judge stated on the record that a Process Server

was the Best way, which is what I was also advised by several attorneys. Then after a few words in collusion with Mrs. Sherman I was then ordered NOT to use a Process Server. This is a clearly limiting myself in properly utilizing court approved services to efficiently defend myself and our daughter's life.

On this same day I was also ordered NOT to come to court on days I'm with our daughter, which greatly obstructs my ability to utilize the time given to get paperwork accomplished on top of not being able to utilize a process server? A main reason I utilized a process server was so that I could maximize the little time ordered to me with my daughter.

Please reference Motion #1 where I had serious concerns for the safety of our daughter. My experiences from the mother has been one of verbal and physical abuse. To assure that the correct decision was made to place our daughter in the care of her mother as trial proceeded, I requested that Mental Health evaluations be granted for the safety of our daughter. The judge denied that motion and called it frivolous in collusion with Mrs. Sherman once again.

I believe that the Judge knew that due to the mother's behavior in open court that if a mental health evaluation was to be conducted the findings would not be in favor of the mother, hence ONLY I the father was ordered to endure this evaluation. Your honor manipulated the record in favor of the mother in a pre-meditated intentional and unlawful manner.

On this day I was also ordered to endure a Mental Health Evaluation, for reasons that were very biased and unwarranted.  A Mental Health Evaluation I believe should have been fairly ordered for both parents equally, if necessary.

9.  On October 15th 2018 your honor writes on the O.S.C. ORDER describing documents and specific pictures of our child's private area etc. that were included in my O.S.C (all photos were censored).

Then on October 26th 2018 your honor stated on the record transcript page #21 that the pictures and documents I submitted your Honor had thrown away, discarded.

However, this same day October 26th 2018 transcript pages #6 thru #8, your honor had just stated on the record that nothing was looked at or reviewed. How could that be true... when your honor gave specifics on the O.S.C. order?

I believe that your honor knew the dangers our child may be in, that's why there was specific notice by your Honor, that nothing was seen.

10. On November 14th 2018 transcript page #4 line #20 thru #25, your Honor clearly stated that the underlying petitions would be transferred to another judge, and we were to only

complete the OSC for more visitation. This will also prove to be a false statement. I follow your Honors instructions and only discuss matters of the O.S.C. Then when Ms. Sherman takes the floor your Honor allows the underlying petitions to be conferred.

11. On November 14th 2018 your honor along with Ms. Sherman, debate my right to religious beliefs. I love our country and love to understand, celebrate and welcome all religions. This experience in court was extremely shocking and made me feel very belittled. See transcript page #12 thru #17.

   Especially due to the fact that this day was on a Tuesday. This is when I have court ordered time with my daughter. However, there was NO hesitation to interfere or adjust time from me, the father.

12. On November 29th 2018 transcript page #58 thru #61, your Honor even helps opposing counsel Ms. Sherman several times with building foundation and questioning her witness. Your Honor makes sure to get all Ms. Sherman's information.

   There were moments this day when your Honor would even physically cheer on the bench, in open court. Whenever opposing counsel Ms. Sherman conspired successfully with your honors guidance to an intended outcome. You honor would say "Yes" under low volume and shake her fist in favor of Ms. Sherman.

13. Also, November 29th 2018 transcript page #89 thru #90 your honor goes outside the O.S.C. being heard for our daughter's health and safety, disregarded the fathers concerns and cross Order of Protection. Then your honor goes on record to lead witness back into DV allegations discussions. There is no fairness or even effort to hear my defense from these false allegations, which to my understanding were going to another judge.

14. On November 29th 2018 your honor manipulates and minimizes the father's evidences in defense of mothers DV allegations. Judge violates due process and almost concludes the hearing without allowing cross examination of the mother's testimony of allegations.

   Transcript page #87 line #10 thru #23 your Honor was attempting to finalize the O.S.C. I then had to question/remind your Honor of common procedure such as cross examine of the witness. Which would prove devastating to the father if not allowed in defense.

   The child's grandmother on the father's side is a credible witness to the facts of mother's testimony. The father's mother should be able to testify in response to all testimony given by the child's mother on the record. Instead the judge limits my mother witness, to one specific item, when there are several to which my mother has been

witness to. This too is a clear violation of due process of law. See transcript November 29th 2018 page 100-104.

15. On November 29th 2018 the Judge again stops me from asking questions about my Mental Health Evaluation, on the record. See transcript page #19 line #1 thru #5.

16. I had to defend myself from allegations of Bi-Polar, twice. The first time was at the start of this case. A doctor's diagnosis was furnished to Hon. Tracey Bing. This document disproved all allegations that I suffer from alleged bi-polar disorder.

Then again on October 26th 2018 in the midst of trial this same allegation of bi-polar disorder was brought up. Transcript page #48 thru #49, your Honor stated "Let me see that"... as if planned, working together in collusion with attorney Ms.Sherman. I believe that they were expecting me to not have this proof, on hand, so far into the case.

Your honor was angered that I in fact, did have the doctors supporting documents for my defense on hand. When I presented this exhibit for the second time to your honor, I was immediately retaliated against. I alone was instructed by your honor, to undergo a Mental Health Evaluation within the Bronx Family Court. I believe that given the child's mothers aggressive behavior in court the judge knew that the mother may be unfit hence only I, the father, was sent to be evaluated.

Defending myself from opposing counsel allegations is expected but having to defend myself from your honors prosecution is deplorable.

17. On November 29th 2018 transcript page 18 thru 23 your honor gets very angry and lashes out toward me. Your honor even begins to ask me questions then immediately yells at me to stop when I begin to answer.

18. There were several times in court on November 29th 2018 where your Honor deems this case a mistrial. See transcript page #8, #14, #15. Specifically, page #14 line #18 thru #21.

Why or how your Honor came to the conclusion of a mistrial, is concerning to me. Especially due to the fact that this "injustice" was allowed to continue.



# AMI GLOBAL SECURITY

6 Christine Drive * Chestnut Ridge * New York *10977
914 329-0338

Security analysis event of  5-31-2017

Subject:  Mr. Vinod Persad

Overview:

Mr. Vinod Persad is in a child custody negotiation with Family Court, Child Protective Services, and the child's mother.  One of the primary challenges to this goal is the domestic dispute incident that resulted in a dual arrest of Mr. Persad and his wife.  The incident was recorded on live video.  Upon observation, subject interview and analysis, the following observations are provided for testimony:

Summary of Events:

1.  Upon arrival from the airport everyone was tired and short tempered.

2.  The baby was at the edge of the bed and the Subject feared her injury by a fall.

3.  He concluded the baby was neglected and picked her up to place her in the crib.

4.  The Mother reacted by trying to take the baby from his arms and he reacted to keep her.

5.  The duel escalated to flight and pursuit where the Subject and wife both tried to get through the narrow bedroom doorway resulting in her falling down.

6.  The flight-pursuit scenario intensified where the Subject tried to take a defensive posture, a primate threat posture shaking his fist at her but did not strike her, followed by a retreat to flight posture, grabbing his pajama bottoms and exiting the residence to take the baby across the street to their baby-sitter.

7.  The wife called the police and reported a domestic dispute.  The police arrived, reviewed the videotape, and arrested the Subject and his wife.

8.  The pile on of charges by the police, that included "kidnap" just do not coincide with the reality of what happened nor was it supportable by what was observed on the videotape. The charges were ACD and dropped.

*Registered Defense Trade Broker – US Department of State, Bureau of Political-Military Affairs, Directorate of Defense Trade Controls Compliance, Washington, DC 20522-0112  and Federal Firearms Licensee, Bureau of Alcohol, Tobacco and Firearms, and New York State Gun Dealer – International Traffic–in-Arms Regulations [ITAR]*



# AMI GLOBAL SECURITY

9.  The subject was not kidnapping his child wearing his pajamas. He was removing the child from a hostile situation that was escalating beyond his ability to control it. The subject's wife emotional outburst reacts to situations between them directly to extreme physicality. In this video, the Subject was in a defensive posture, restrained from physicality, and took a flight posture in response to a pursuit posture. Removing the child from this situation demonstrated a protective presence of mind.

10. In short, he saw the child about to fall of the edge of the bed, he picked the baby up, and scolded his wife for being inattentive, she reacted by trying to take the child from him forcefully not tenderly, he resisted, she insisted, he fled, she chased, she fell, he exited, she called the police, they arrested everybody and filed a pile of charges that could not stick, that barely satisfied the penal codes filed in the arrest.

The Subject has a highly developed sense and demonstrative protective instincts for this child. The degenerative relationship was toxic to all involved when they are together, since both parents cannot agree on how and which of them, will take care of the child to the others satisfactory expectation. Separately, the child and father thrive and interact in a healthy relationship with each other. The Subject is protective, self-less, and devoted to the safety and care of this child as can be ascertained by the video record provided.

Submitted by:

Anthony Melé
Consultant

AMI GLOBAL SECURITY, LLC is registered with the U.S. Department of State, Office for Military-Politico Affairs and is a Federal Firearms Licensee and NY Gun Dealer

**Jeremy Cassius, M.Ed, LPC**
Licensed Professional Counselor
4100 Spring Valley Rd, Suite #275, Dallas, TX 75244
Phone: 214-830-8214, Fax: 866-242-3378
**Professional Counselor Licensure #65426**

------------------------------------------------------------------------

**Mental Health Evaluation**

**Client:** Mr. Vinod Persad        **Birth date:** 10/22/1985        **Age:** 33

**Date of Evaluation:** 3/25/2019, 3/28/2019, 3/29/2019, 4/7/2019

**Reason for Referral**

Mr. Persad was referred by his attorney for a mental health assessment to determine whether, to safeguard his daughter's best interest, his daughter, Zemirah Persad, should reside primarily with with him.

**Methods of Evaluation**

1. Interview of Mr. Vinod Persad to understand psychological stress and hardship
2. Administration of the Beck Depression Inventory to Mr. Vinod Persad to determine if depression is present and to measure severity.
3. Administration of the Beck Anxiety Inventory to Mr. Vinod Persad to determine levels of anxiety.
4. Administration of the Personality Assessment Inventory to Mr. Vinod Persad to determine diagnostic probabilities and/or presence of psychopathology.

**Relevant Historical Background**

Mr. Persad initially met Ms. Noemi Rodriguez when he finished high school in 2005. He met her at an automobile show. Mr. Persad was physically attracted to Ms. Rodriguez and he thought she had a nice personality. At the time that he met her, Mr. Persad was working for Triple "J" Automotive Special Equipment Shop then Jetblue and Delta Airlines at JFK airport in New York. Ms. Rodriguez was working for and insurance agency doing clerical work. Before that, she was a cashier at a grocery store. The couple dated for a few months when they initially met and then Ms. Rodriguez moved to Washington, D.C. The couple did not speak for several years and reconnected in 2012. In 2012, they reunited in Queens, New

1

York. In 2012-2013, Ms. Rodriguez moved in with Mr. Persad but was still travelling back and forth for her college admissions officer job in Washington, D.C.

In the beginning, Mr. Persad had a healthy relationship with Ms. Rodriguez. He introduced her to his family and friends and was proud of his relationship with her. In 2013, she moved to New York permanently. The couple began discussed getting married and having a baby together but Mr. Persad was skeptical because of the way that Ms. Rodriguez was behaving toward him. They would argue about his involvement in the relationship because he was working and she was at home. They would argue at least once a month and then they would move forward. However, they still wanted to have a baby together because they saw a future together. They just did not think they had the money yet to get married. Their plan was to have the baby first and then have a wedding.

Ms. Rodriguez gave birth to Zemirah was born on August 22nd, 2016. They were together for four years before having a child together. Once Zemirah was born, Ms. Rodriguez wanted to move out of the state. Mr. Persad did not want to leave because he was working with the New York Transit Authority. He has been working there since 2014. The couple eventually compromised by going to Orlando, Florida twice where Mr. Persad's family lived. They thought about moving to Florida. The plan would be Mr. Persad working in New York and buying a place in Florida to move when Zemirah would be older. This plan made sense for them because they had family there.

On May 31st, 2017, Mr. Persad and Ms. Rodriguez were in a major argument. She asked him to make her a sandwich and he did not do it fast enough and he did not make it the way that she wanted him to make it. She told him that he did not care about her and her daughter. She blamed him for everything. Mr. Persad went to pick up his daughter and Ms. Rodriguez accused him of taking their daughter away from him. As soon as he picked up the baby, Ms. Rodriguez jumped up to grab the baby and she asked for her baby back. He was holding the baby in his left arm and pushed back Ms. Rodriguez to keep a distance between her and the baby. He took the baby over to the babysitter across the street.

When he left the house, Ms. Rodriguez called the police. The police came and they arrested Mr. Persad for domestic violence charges. After they reviewed the home surveillance video, they also arrested Ms. Rodriguez. Ms. Rodriguez was let out of jail early to care for her baby and Mr. Persad spent one night in jail. After that evening on May 31st, 2017, Mr. Persad never returned to that apartment. Rather, he went to live with his parents. Ms. Rodriguez returned to the apartment and she is still living there with Zemirah.

Since the incident happened in May 2017. Mr. Persad has been able to watch on the video surveillance what has been happening with his daughter. He saw Ms. Rodriguez and her best friend from New Jersey take Zemirah and her things away from the apartment in July 2017. This was concerning to Mr. Persad because they did not have a court order. In August, 2017, Mr. Persad filed a petition for sole custody.

Currently, Mr. Persad picks up Zemirah on Sunday and he returns on Tuesday at 6PM. He is hopeful that he can get more time with her. He believes that it will be safer for her.

## Social/Education History

Mr. Persad was born in Trinidad and Tobago on October 22nd, 1985. His mother is Ms. Kissundai Persad and his father is Mr. Ramcharan Persad. He has two older brothers and one younger brother. Mr. Persad has never been married. Zemirah is his only child. Currently, Mr. Persad is living with his parents in their home in Queens, New York.

Mr. Persad had a normal childhood in Queens, New York. He was three years old when he came from Trinidad. His father ran a taxi company and his mother worked for McDonalds. His parents always had a good marriage. His family was always close. They always lived together in the same apartment. He shared a room with his other brothers. His family was always caring for each other. His parents always taught him to put family first. This has always been important for him.

Mr. Persad went to public schools in Queens, New York for elementary school, and junior high school. He attended Aviation High School in Long Island City, New York. He always did well in school. He was involved in student government and extracurricular activities in high school. He always had a good group of friends. He played a lot of sports. He played volleyball and handball. While at Aviation high school, he worked as a file clerk for an insurance agency.

Mr. Persad graduated high school in 2004-2005. When he graduated from Aviation high school, he received his Airframe and Powerplant License which allows him to apply for jobs to work on airplanes. After high school, he worked for John F. Kennedy airport in materials. He did logistics for parts that came in for Jetblue Airways. He worked for Jetblue for five years. Following that, he worked for Panasonic Avionics at John F. Kennedy Airport. He worked for Panasonic for five years.

Currently, Mr. Persad is working for the New York Transit Authority as an inspector for trains. He has been working there for six years. For four years, he worked for the

Emergency Response Unit.   With this position, he is able to support himself and his daughter.

Mr. Persad's relationship to Ms. Rodriguez drastically changed in 2015 when she became pregnant in 2015.  "She became more aggressive with me...she was confrontational, argumentative, and I was walking on glass...eggshells would have been easy," said Mr. Persad.  Ms. Rodriguez refused to go to couples counseling.  Things continued to escalated until the altercation on May 31st, 2017.  Mr. Persad claims that he was trying to protect Zemirah during the altercation.

Currently, Mr. Persad does not believe that his daughter is safe with Ms. Rodriguez.  He witnessed Ms. Rodriguez going into a rage once a week before she was pregnant.  He does not know what caused her rage but he believes that it had something to do with the fact that he was working and she was not.  He believes that Ms. Rodriguez is trying to extort money from him through his daughter.  She puts prices on visitation with his daughter.  This has been happening to him since the divorce.  Mr. Persad called Child Protective Services (CPS) on his wife because he noticed that his daughter had a black eye.  When he questioned his ex-wife about his daughter, she would not give him an answer.

**Issues of Child Custody**
Mr. Persad believes that Ms Rodriguez is unsuitable to serve as a parent to Zemirah because she is neglectful of Zemirah.  He does not believe that she feeds her on schedule, and that she does not change her diapers.  Mr. Persad took pictures of her diaper rash when he picked her up from Ms. Rodriguez.  He took Zemirah to the emergency room on April 29th, 2018 and the doctor (Enrique Pena) said that she had a fungal infection from not being cleaned properly.  Following the fungal infection, Mr. Persad does not believe that Ms. Rodriguez administered the medication in a timely manner.

In December 2017, Mr. Persad and Ms. Rodriguez had an argument about milk in the house.  He showed her that there was milk in the house but she still wanted him to go get milk.  She was worried that he was cheating on her and he was going to get the milk by himself.  This is interesting because she asked him to get milk that he claimed they had and then she accused him of going to get milk so he could cheat on her.  This sounds like a "delusional" episode.

When her mother relocated her from Queens to the Bronx, she pierced her ears.  Following this, her ears became infected where they were pierced and closed up.  While they were

4

infected, she re-pierced them.  Mr. Persad begged her not to pierce her ears again.  Zemirah
still has scars on her ears from where they were pierced.

Mr. Persad demonstrated much parental alienation that has taken place through text
messages that he provided with abusive language from Ms. Rodriguez toward him.  He
planned a family 1st birthday celebration for Zemirah with a nice cake and many family
members present but Ms. Rodriguez did not bring Zemirah to the party.  This is one example
of many.

Overall, Mr. Persad is concerned that Zemirah is not safe with Ms. Rodriguez because she is
careless and neglectful with Zemirah.  He is concerned that she is alienating Zemirah against
him and he would like more time with his daughter to prevent this from occurring.  He
wants to make sure that his daughter is safe.

### Test Results and Interpretations

Two behavioral inventories and one personality inventory were administered to  Mr. Persad
to determine if he is mentally stable enough to have primary custody of his daughter: The
Beck Depression Inventory (BDI)[1], and Beck Anxiety Inventory (BAI)[2] and the Personality
Assessment Inventory (PAI)[3].

The BAI, BDI, and the PAI were administered in a controlled testing environment to Mr.
Persad .  He was compliant with the testing and interested in the procedure.  It took Mr.
Persad approximately an hour finish the testing.

### BDI and BAI Report

Mr. Persad's score on the BDI and BAI demonstrate few symptoms of depression and anxiety.
His BAI show that he has a "fear of worst happening" which is most likely related to his fear
of what could happen to his daughter.

---

[1]  The BDI is a series of questions developed to measure the intensity, severity, and depth of depression in patients.  It's composed of 21
questions, each designed to assess a specific symptom common among people with depression.  The BDI has been extensively tested for
content validity, concurrent validity, and construct validity.  The BDI has content validity (the extent to which items of a test are
representative of that which is to be measured) because it was constructed from a consensus among clinicians about depressive symptoms
displayed by psychiatric patients.
[2]  The BAI was developed to address the need to reliably discriminate between depression and anxiety while displaying convergent validity.
This instrument is also strong at addressing panic symptomology.
[3]  The PAI is a 344 item multi-scale test of psychological functioning that assesses constructs relevant to personality and psychopathology
evaluation.  The test measures depression, anxiety, aggression etc in different contexts which helps to provide a comprehensive overview
of psychopathology in adults.

**PAI Report**

The PAI clinical profile reveals no elevations that should be considered to indicate the presence of clinical psychopathology. If Mr. Persad is presenting for evaluation or treatment in a clinical setting, some denial or defensiveness is likely to be responsible for the generally trouble-free picture that he is reporting, as he seems to be reluctant to admit to dysfunction or problems across many areas. The PAI clinical profile is entirely within normal limits. There are no indications of significant psychopathology in the areas that are tapped by the individual clinical scales.

According to Mr. Persad's self-report, he describes NO significant problems in the following areas: unusual thoughts or peculiar experiences; antisocial behavior; problems with empathy; undue suspiciousness or hostility; extreme moodiness and impulsivity; unhappiness and depression; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety; difficulties with health or physical functioning. Also, he reports NO significant problems with alcohol or drug abuse or dependence.

**Child Development and Custody Access**

During a divorce, many decisions are made by the court that affect the overall well being of children. Parental divorce is a highly prevalent risk factor associated with high rates of mental health problems for youth.[4] Many questions arise about what will be the best situation for the children with their best interest in mind. Psychological theories of attachment have provided a wealth of information to demonstrate the importance of children remaining with their parental attachment figures. The development of attachments to parents and other important caregivers constitutes one of the most critical achievements of the 1st year of life and onward.[5] It is important that these attachments be maintained following a divorce.

Relationships with parents play a crucial role in shaping children's social, emotional, personal, and cognitive development, and there is a substantial literature documenting the

---

[4] Boring, J. L., Sandler, I. N., Tein, J., Horan, J. J., & Vélez, C. E. (2015). Children of divorce–coping with divorce: A randomized control trial of an online prevention program for youth experiencing parental divorce. *Journal Of Consulting And Clinical Psychology, 83*(5), 999-1005. doi:10.1037/a0039567

[5] Kelly, J. B., & Lamb, M. E. (2000). Using child development research to make appropriate custody and access decisions for young children. *Family Court Review, 38*(3), 297-311.

adverse effects of disrupted parent-child relationships on children's development and adjustment.[6] The evidence further shows that children who are deprived of meaningful relationships with one of their parents are at greater risk psychosocially, even when they are able to maintain relationships with the other of their parents. There is substantial evidence that children are more likely to attain their psychological potential when they are able to develop and maintain meaningful relationships with both of their parents, whether the two parents live together or not.

Attachment theory also provides a model for understanding how poor parent child relations can lead to childhood depression. A child with a history of insecure attachment is less likely to trust the world as a place of exploration and is more likely to feel helpless[7]. This feeling could cause averse behavior and coping mechanisms. This insecure attachment is likely to lead to symptoms of depression for a child as they develop a hopeless framework and worldview which also affects their peer relationships. Research also demonstrates that children with poor parental relationship are more likely to be referred for psychiatric services.

There have also been studies that demonstrate that divorce and the ensuing parent/child separation can have a long term effect on the children. Wallerstein and Blakeslee (1989) found that longitudinal data that suggest that divorce during childhood and adolescence seriously impacts the development of youth.[8] Research findings demonstrate that the ongoing continuity of the parent/child relationship has importance for children as they enter adulthood.[9]

---

[6] Lamb, M. E. (1999). Non-custodial fathers and their impact on the children of divorce. In R. A. Thompson & P. Amato (Eds.), The post-divorce family: Research and policy issues(pp. 105- 125). Thousand Oaks, CA: Sage.
[7] Armsden, G. C., McCauley, E., Greenberg, M. T., Burke, P. M., & Mitchell, J. R. (1990). Parent and peer attachment in early adolescent depression. *Journal of abnormal child psychology, 18*(6), 683-697.
[8] Wallerstein, J. S., & Blakeslee, S. (1989). Second chances: Men, women, and children a decade after divorce. New York: Ticknor & Fields.
[9] Summers, P., Forehand, R., Armistead, L., & Tannenbaum, L. (1998). Parental divorce during early adolescence in Caucasian families: the role of family process variables in predicting the long-term consequences for early adult psychosocial adjustment. *Journal of Consulting and Clinical Psychology, 66*(2), 327.

7

**Conclusion & Opinion**

In my professional opinion, Ms. Rodriguez's behavior, as described by Mr. Persad, is harmful to the normal development of their daughter, Zemirah. She has neglected her daughter by not being careful with her and being neglectful of her based in his report. He was able to cite many instances of neglect of basic physical needs where Zemirah was not cared for. This needs immediate attention from the court!

Based on the research on parent/child attachment, the attachment of Ms. Rodriguez to her daughter would undoubtedly be negative which could lead to childhood depression if this type of neglect described by Mr. Persad continues.

Fortunately, Zemirah is still young. There is still time to make necessary changes that can make a difference in her overall development. While it would be a poor decisions to take her away from her mother completely, it would be a good decisions to make Mr. Persad the primary parent and to have supervised visits for Ms. Rodriguez. Based on my one sided knowledge, I am concerned for the health, well being, and future psychological adjustment of Zemirah Persad.

It has been brought to my attention that Mr. Persad has a domestic violence claim against him for his behavior in his relationship with Ms. Rodriguez. Based on his description of the incident, he was trying to protect Zemirah and things became out of hand. Ms. Rodriguez was cited that evening by the police too. Based on the psychological testing results, Mr. Persad is non-violent and should not be considered a domestic violence threat.

While I have only heard one side of this story, it is my professional opinion that, with the absence of any undisclosed psychologically dangerous issues posed by Mr. Persad's lifestyle, would have a more stable psychological upbringing with her father than her mother. However, based on attachment theory, supervised visits with Ms. Rodriguez would insure the safety of Zemirah and be more psychologically healthy for her.

Based on the psychological testing and interviewing, deviant behavior and/or a mental health diagnosis/domestic violence offender were unfound with Mr. Persad and he appears to be well adjusted psychologically and responsible. He works full time and will do whatever is necessary to provide for his daughter and give her a safe environment to live in.

Although the literature stresses the importance of the children being with both parents, it is not discussing the case when one parent could have a psychologically dangerous effect on

8

the psychology and physical safety of the children.  Should Zemirah remain with Ms. Rodriguez, or even visit her unsupervised, it is likely that she could continue to be a victim to neglect and abuse.

It is my professional opinion, that Ms. Rodriguez's neglectful behavior as demonstrated by his report and evidence of Mr. Persad and her lack of interest for Zemirah has already caused some attachment issues and had a detrimental effect on her psychologically.  In order, for her to develop without avoidable trauma, I recommend that she spends more time with Mr. Persad and as little time as possible being exposed unsupervised to the negative behaviors of her mother.

*Jeremy Cassius*    4/18/2019

—F08049ECBE19493...

**Jeremy Cassius, M.Ed**

**Licensed Professional Counselor, LPC**

**9**